IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| LARRY PERKINS, | ) | |
| | ) | CASE NO. 1:14-CV-985 |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KENNETH S. McHARGH |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OPINION &** |
| | ) | **ORDER** |
| Defendant. | ) | |

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 12). The issue before the undersigned is whether the final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Larry Perkins's ("Plaintiff" or "Perkins") applications for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq*., and for a Period of Disability and Disability Insurance ("DIB") benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, is supported by substantial evidence and, therefore, conclusive.

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision.

## I.  PROCEDURAL HISTORY

Plaintiff filed prior applications for SSI and DIB benefits in December 2005. (Tr. 130). After the Social Security Administration denied these applications initially and upon reconsideration, Administrative Law Judge ("ALJ") Peter Beekman issued an unfavorable decision dated September 20, 2007. (Tr. 130-39).  This decision is hereinafter referred to as the

"2007 Disability Determination." Perkins did not appeal this decision to the Appeals Counsel, thus making the ALJ's September 20, 2007, decision the final decision of the Commissioner.

On January 22, 2008, Perkins filed the SSI and DIB benefits applications that are currently at issue before the Court. (Tr. 253-55, 256-59).  Plaintiff alleged that he became disabled on October 1, 2007, due to suffering from arthritis of both feet and diabetes. (Tr. 253, 256, 281).  The Social Security Administration denied his claims initially and upon reconsideration. (Tr. 172-78, 186-94).

At Plaintiff's request, an administrative hearing was held before ALJ Dennis LeBlanc on May 7, 2010. (Tr. 153).  On July 21, 2010, ALJ LeBlanc issued an unfavorable decision. (Tr. 150-61).  Plaintiff appealed the decision to the Appeals Council, which vacated ALJ LeBlanc's determination and remanded the case for further proceedings. (Tr. 166-70).

Pursuant to the Appeals Council's order, a supplemental administrative hearing was held on September 13, 2012, before ALJ Thomas Randazzo. (Tr. 28-82). Plaintiff, represented by counsel, appeared and testified before the ALJ. (*Id*). A vocational expert ("VE"), Nancy Borgenson, and a medical expert ("ME"), Hershel Goren, also appeared and testified. (*Id.*).

On November 16, 2012, ALJ Randazzo issued an unfavorable decision, finding Plaintiff was not disabled. (Tr. 12-22).  After applying the five-step sequential analysis,[1] the ALJ

---

[1] The Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability."  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The Sixth Circuit has summarized the five steps as follows:

(1)     If a claimant is doing substantial gainful activity–i.e., working for profit–she is not disabled.

(2)     If a claimant is not doing substantial gainful activity, her impairment must be severe before she can be found to be disabled.

determined Plaintiff retained the ability to perform work existing in significant numbers in the national economy. (*Id.*).  The Appeals Council denied Plaintiff's request for review, making the ALJ's November 16, 2012, determination the final decision of the Commissioner. (Tr. 1-4).

Plaintiff now seeks judicial review of the ALJ's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

## II.  EVIDENCE

### A.  Personal Background Information

Plaintiff was born on December 28, 2015, and was 51-years-old on the alleged disability onset date, making him an "individual closely approaching advanced age." 20 C.F.R. §§ 404.1563(d), 416.963(d).  Plaintiff subsequently changed age category to a "person of advanced age." 20 C.F.R. §§ 404.1563(e), 416.963(e).  He completed the eighth grade. (Tr. 52).

### B.  Physical Impairments

#### 1.  Evidence Connected to Plaintiff's First Application

In September 1999, Plaintiff was treated at the Cleveland Clinic for bilateral foot pain. (Tr. 343).  He was diagnosed with bilateral sinus tarsi pain with subtalar arthrosis.  The physician recommended the options of using a brace, medication, or surgery. (*Id.*).

---

(3)    If a claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

(4)    If a claimant's impairment does not prevent her from doing her past relevant work, she is not disabled.

(5)    Even if a claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that accommodates her residual functional capacity and vocational factors (age, education, skills, etc.), she is not disabled.

*Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990); *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

On November 29, 2005, Plaintiff presented at South Pointe Hospital with complaints of nausea, vomiting, and dizziness. (Tr. 374). Perkins was admitted, treated for diabetes ketoacidosis, and subsequently discharged in an improved condition on December 2, 2005. (*Id.*). During the admission, Perkins underwent a psychological consultation which resulted in a diagnosis of alcohol dependency and depressive disorder. (Tr. 384).

### 2. Evidence Connected to Plaintiff's Second Application

On June 19, 2007, treatment notes from the emergency department at MetroHealth Medical Center indicated Plaintiff presented for the first time in a number of years. (Tr. 436). Plaintiff complained of polyuria, polyphagia, unintended weight loss, and pain to both feet and knees. Perkins explained he suffered from his pain symptoms for months, but the remainder of his symptoms began two weeks prior when he ran out of insulin, due to being unable to finance a refill. (*Id.*). The physician diagnosed hyperglycemia and noncompliance with medication. (Tr. 437). Plaintiff was treated with fluids and insulin, and was given a voucher for one month of medication. He was advised to get a job where he was required to sit, rather than stand. (*Id.*).

From August 2007 through January 2008, Perkins attended a monthly appointment to manage his diabetes at Care Alliance. (Tr. 452-61). During his October 2007 visit, Plaintiff reported that he had stopped smoking three months prior and drinking alcohol six months prior. (Tr. 457). He was diagnosed with diabetes mellitus, poorly controlled; diabetic neuropathy; and hypertension. Neurontin was added to his medications. (*Id.*).

On April 18, 2008, Plaintiff underwent a physical consultative evaluation conducted by Wilfredo Paras, M.D. (Tr. 493-94, 497-500). Based on Perkins's reports, Dr. Paras concluded that Perkins suffered from a history of diabetes mellitus; hypertension; arthritis in the knees, ankles, and low back; hepatitis B; and depression. (Tr. 493-94). Dr. Paras noted that recent x-

4

rays showed mild degenerative change in the right knee and no acute pathology in the right ankle. (Tr. 494-96).

Dr. Paras explained that based on Perkins's description of his medical history and objective findings, his ability to perform work related physical activities was limited by frequent dizzy spells, constant pain in both knees and ankles, pain in the low back, and symptoms of diabetic peripheral neuropathy. (Tr. 494).  The doctor also stated that manual muscle testing and range of motion examination revealed pain in the knees on limited flexion, pain in the right elbow on limited range of motion testing, stiffness in the low back on limited range of motion testing, and limited flexion in the hips. (*Id.*).

On May 28, 2008, state agency reviewing physician Jon Starr, M.D., found that Plaintiff could perform a range of medium work that included lifting 50 pounds occasionally and 25 pounds frequently; standing, walking, or sitting for a total of 6 hours in an 8-hour workday; occasionally balancing; and avoiding concentrated exposure to hazards. (Tr. 502-05).  Dr. Starr explained that he examined the findings from the 2007 Disability Determination, but that Perkins's current file contained new and material changes. (Tr. 508).  The doctor further explained that the prior RFC was not being adopted because new information showed that Plaintiff had degenerative changes in his knees and a current physical examination revealed a reduced range of motion.  Dr. Starr also opined that while Plaintiff suffered from diabetes, he was non-compliant with treatment and there was no objective medical evidence to show neuropathy. (*Id.*).

In August 2008, state agency reviewing physician Nick Albert, M.D., conducted a second review of Perkins's file. (Tr. 510-17).  He concurred with Dr. Starr's opinion, but added

limitations of frequent climbing, kneeling, crouching, and crawling, as well as occasional stooping. (Tr. 512).

Perkins presented to MetroHealth Medical Center on September 15, 2008, for treatment of diabetes. (Tr. 613).  It was noted that Plaintiff's diabetes was poorly controlled and the concept of diabetic self-management was discussed. (Tr. 616).

In November 2008, Plaintiff treated with Kelly Jones, M.D., for pain in his low back, legs, and feet. (Tr. 591).  Perkins's neurological examination was normal as was his gait. (Tr. 592).  There was mild pain in range of motion of the lumbar spine and muscle weakness in the bilateral lower extremities. (*Id.*).  Dr. Kelly prescribed pool therapy and a TENS unit. (Tr. 593). The doctor stressed the importance of showing up for appointments. (*Id.*).

November 2008 x-rays of Plaintiff's knees showed mild medial compartment narrowing with secondary osteoarthritis in the right knee. (Tr. 586).  A small joint effusion was also present. The left knee showed mild medial compartment narrowing with minimal osteophyte formation. There was minimal joint effusion. (*Id.*).

On January 15, 2009, Perkins returned to MetroHealth due to continuous sharp, burning pain made worse by standing and walking. (Tr. 570).  Plaintiff stated his pain was in his lumbar spine, knees, and feet. Plaintiff reported trying to exercise to bring his blood sugar down, but pain made it unable to tolerate.  Perkins was given a prescription of Neurontin and instructed to continue Ultram and protect his back while performing a regular program of improving strength and flexibility. (Tr. 570-71).

On January 16, 2009, Plaintiff treated with podiatrist Michael Bodman for complaints of foot pain. (Tr. 567-69).  A vascular examination showed the right and left posterior tibial pulses were not palpable and the right and left dorsalis pedis pulses were barely palpable. (Tr. 568).

6

There was minor venous insufficiency.  A neurological examination showed a lessened vibratory sensation in both feet. (*Id.*).   The podiatrist also described Plaintiff's toenails as yellow, thickened, and subungual. (Tr. 569).  Perkins had an adequate range of motion in his feet and ankles, no joint swelling, normal muscular strength, and a normal gait.  Dr. Bodman diagnosed onychomycosis with pain, nail dystrophy, hyperkeratoses, and early vascular disease without acute ischemia. The doctor recommended treatment of Plaintiff's nail infection and a six week trial of Neurontin. (*Id.*).

On November 19, 2009, Perkins presented at MetroHealth due to right shoulder pain and dizziness. (Tr. 523).  He indicated that his blood sugar was high, though he rarely checked it. Plaintiff stated that he felt dizzy everyday throughout the day.   It was noted that his schizophrenia was poorly controlled and he had been cutting his medication in half for months to make it last, though he had finally run out. (*Id.*).  Perkins was diagnosed with diabetes and poorly controlled schizophrenia, which was making him unable to properly care for his diabetes. (Tr. 525).  He was also diagnosed with rotator cuff syndrome and prescribed Naproxen. (Tr. 526).

In January 2010, Plaintiff presented to MetroHealth for a diabetes follow up, and also complained of right shoulder pain and bilateral knee pain. (Tr. 623-26).  A physical examination was normal aside from decreased strength in the lower extremities, though poor effort was noted. (Tr. 625).

On December 30, 2010, Plaintiff returned to MetroHealth for a refill of blood pressure medication, but was agitated due to leg pain. (Tr. 698).  He reported having trouble walking and using a cane. The physician recommended knee x-rays and Motrin for pain. (*Id.*).

Plaintiff underwent a series of x-rays in January 2011. (Tr. 704).  An x-ray of the lumbar spine showed degenerative changes throughout. An x-ray of the left knee showed mild

degenerative changes.  The right knee had mild narrowing of the medial aspect of the knee joint space, which was slightly worse than the prior study of November 2008. (*Id*.).

In February 2011, Plaintiff was seen by Brendon Astley, M.D. (Tr. 713-18).  The physician reviewed Plaintiff's x-rays and conducted a physical examination. (*Id.*).  Plaintiff's lumbar spine flexion was not painful and extension was mildly painful. (Tr. 717).  The lumbar spine was tender to palpation. (*Id.*).  His sensation was decreased to vibration and strength was slightly decreased in the right and left lower extremities. (Tr. 718).  Dr. Astley diagnosed primarily localized osteoarthrosis in the lower leg and recommended pool therapy, weight control, and physical therapy. The doctor also noted that diabetic neuropathy was Plaintiff's main issue and prescribed Lyrica because Neurontin failed in the past. (*Id.*).

On April 7, 2011, Plaintiff attended a follow up appointment for high blood sugar. (Tr. 759-62).  His Metformin and insulin were increased. (Tr. 762).

### C.  Mental Impairments

On March 26, 2008, Perkins underwent a mental status examination with psychologist Sally Felker, Ph.D. (Tr. 468-72).  Plaintiff indicated that he had problems with depression, anxiety, trouble sleeping, frequent crying spells, and physical pain. (Tr. 469).  Dr. Felker observed no delusional or paranoid thoughts or hallucinations. (*Id.*). Plaintiff's attention span and ability to concentrate were restricted, while his insight and judgment were fair.  (Tr. 470).  Dr. Felker diagnosed dysthymia and chronic pain disorder associated with psychological factors and a medical condition. (Tr. 471).  She assigned a Global Assessment of Functioning ("GAF")[2] score of 53, representing moderate impairments. (*Id.*).

---

[2] A GAF score "is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 n.7 (6th Cir. 2006) (*quoting* DSM-IV-TR at 34) (internal notations omitted).  A GAF score in the range of 51 to 60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate

Dr. Felker opined that Perkins had mild impairments in his ability to concentrate and attend to tasks. His ability to understand and follow directions was not impaired, but his capacity for carrying out tasks was compromised because of chronic pain and a depressed mood. Plaintiff's ability to relate to others and deal with the public was moderately impaired. Additionally, Plaintiff's ability to relate to work peers, supervisors, and to tolerate stress in the workplace was moderately restricted due to chronic pain and depression. (*Id.*).

On April 10, 2008, state agency reviewer Steven Meyer, Ph.D., assessed the record. (Tr. 473-89).  He found evidence of an affective disorder and substance abuse disorder. (Tr. 473). Dr. Meyer opined that Plaintiff was mildly limited in activities of daily living and maintaining social functioning. (Tr. 483).  Perkins was moderately limited in his ability to maintain concentration, persistence, or pace. (*Id.*).  Dr. Meyer adopted the findings of the prior ALJ because there was no substantive or material change in the current medical evidence. (Tr. 489). The prior mental residual functional capacity was that Plaintiff had mild limitations in his ability to perform non-complex work. On August 13, 2008, state agency reviewer Vicki Casterline, Ph.D., affirmed Dr. Meyer's assessment. (Tr. 509).

On October 8, 2008, Pamela Budak, LISW, performed a mental health assessment of Perkins. (Tr. 603-07).  Plaintiff explained that he was experiencing auditory hallucinations, which had begun one year prior. (Tr. 603).  His other symptoms included depression, anxiety, decreased sleep, agitation, decreased concentration, visual hallucinations, an increase in isolation, crying spells, and anhedonia. (Tr. 604).  Budak described Perkins as having poor hygiene, but being well-oriented and cooperative, having clear and coherent speech, displaying a logical and organized thought process, having good judgment, and demonstrating sustained

difficulty in social, occupational, or social functioning (e.g., few friends, conflicts with peers or co-workers).

attention and concentration. (Tr. 606).  Plaintiff described his mood as "like a roller coaster." (*Id.*).  Budak diagnosed major depression with psychotic features and assigned a GAF score in the range of 51 to 60, indicating moderate symptoms. (Tr. 607).  She recommended outpatient psychiatric treatment. (*Id.*).

On October 10, 2008, Plaintiff met with Michael Tran, M.D. (Tr. 600-01).  Aside from Plaintiff's statements of auditory and visual hallucinations and a depressed mood, his mental status examination was largely normal. (Tr. 600-01).  Plaintiff's thought process was logical, he was calm and friendly, his speech was clear, and his attention and concentration were sustained. (*Id.*).  Dr. Tran opined that Perkins was stable but depressed and stressed. (Tr. 601).  Plaintiff was prescribed Abilify and instructed to continue Zoloft. (*Id.*).

Perkins returned to Dr. Tran on November 12, 2008. (Tr. 589-90).  Plaintiff stated that he was doing better, including feeling less depressed and anxious and having improved sleep. (Tr. 589).  However, he also indicated that his concentration was poor; he had decreased energy, motivation, and interest; and increased worry. Plaintiff indicated that Abilify decreased his auditory hallucinations, but he had run out of medication about one week prior and the hallucinations had returned. A mental status examination was normal aside from an anxious and sad mood. (*Id.*).  Dr. Tran opined that Perkins was stable, but depressed, stressed, and psychotic. (Tr. 590).  The doctor increased Abilify and continued Plaintiff on Zoloft. (*Id.*).

On December 12, 2008, Plaintiff returned to Dr. Tran and reported a better mood and less auditory hallucinations due to taking Abilify. (Tr. 582-83). Dr. Tran opined that Perkins was stable but stressed. (Tr. 583).  The doctor discontinued Abilify due to cost and started Plaintiff on Invega. (*Id.*).  Later that month, Plaintiff returned to Dr. Tran with reports that he was doing worse, with feelings of depression, anxiety, poor sleep, confused thinking, and auditory

hallucinations. (Tr. 578-79).  Plaintiff felt Invega was not helpful. Perkins' mental status examination was normal, aside from a depressed and anxious mood. (Tr. 578-79).  Dr. Tran discontinued Invega and restarted Abilify. (Tr. 579).

On January 6, 2009, Plaintiff's behavioral health care was transferred to Tina Oney, APN. (Tr. 565).  Oney performed an examination of Perkins, during which he described auditory hallucinations, depression, loneliness, low motivation, anxiety, and poor concentration. (Tr. 574). After an objective mental status examination, Oney described Perkins as cooperative, anxious, well oriented, displaying clear and goal-directed speech, having a logical and organized thought process, good recent and remote memory, sustained attention and concentration, and having a depressed mood. (*Id.*). Oney diagnosed major depression with psychotic features and assigned a GAF score in the range of 51-60. (Tr. 576).

Plaintiff treated with Oney again on February 12, 2009. (Tr. 553). Plaintiff indicated that he was easily agitated, forgetful, and paranoid. (*Id.*).  Aside from a depressed mood and auditory hallucinations, Perkins's mental status examination was generally normal. (Tr. 553-54).

On May 4, 2009, Perkins reported to Oney that he was no longer as depressed and felt medication was helping. (Tr. 536).  He indicated that auditory hallucinations had lessened since taking Seroquel. However, Perkins still felt unable to take the bus due to paranoia and was having issues with his physical health. (*Id.*). Oney diagnosed schizophrenia and recommended that Plaintiff continue his current Seroquel dose. (Tr. 538).

On December 12, 2009, Oney, under the supervision of K. Brocco, M.D., completed a mental residual functional capacity assessment. (Tr. 519-20).  Oney opined that Perkins was "extremely limited" in all work-related mental activities. (Tr. 519). She explained that Plaintiff

was very paranoid and unable to tolerate people or public places, was easily agitated by others, and had a low tolerance for frustration. (Tr. 520).

On May 11, 2010, Perkins reported to Oney that his medications were helpful and he was less depressed. (Tr. 639).  He also indicated that his sleep had improved and auditory hallucinations were less. (*Id.*).  Oney recommended continuing Seroquel for paranoia. (Tr. 640).

In July 2010, Plaintiff reported that his anxiety had recently worsened, but he was sleeping better and experienced less depression. (Tr. 657-58).  His mental status examination was generally normal, aside from poor memory and a variable attention span (*Id.*).  Plaintiff's mood was euthymic. (Tr. 658).  During December 2010, Oney increased Zoloft to combat Perkins's depression and stopped Seroquel to see if Perkins's glucose control would improve. (Tr. 787-88).

### D.  Expert Testimony

During Plaintiff's administrative hearing, medical expert Dr. Hershel Goren testified as to Plaintiff's physical and mental impairments after having conducted a review of all the medical evidence. (Tr. 48).  Dr. Goren testified that he could not identify any impairments arising from Plaintiff's physical ailments like diabetes or symptoms of pain. (Tr. 49).

In regard to mental impairments, Dr. Goren opined that Plaintiff had major depressive disorder and pain disorder associated with psychological factors and his general medical condition. (*Id.*). The doctor found that Plaintiff suffered from mild difficulties in activities of daily living and maintaining concentration, persistence, or pace. (Tr. 51).  He indicated moderate difficulties in maintaining social functioning. (*Id.*).  Dr. Goren testified that Plaintiff could perform work that involved only superficial interpersonal interaction with supervisors, co-workers, and the general public. (Tr. 52).  Plaintiff could not be involved in arbitration;

negotiation; confrontation; supervision of others; and having responsibility for the health, safety, or welfare of others. (*Id.*).

### III. SUMMARY OF THE ALJ'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2. The claimant has not engaged in substantial gainful activity since October 1, 2007, the alleged onset date.

3. The claimant has the following severe impairments: diabetes mellitus with neuropathy, schizophrenia/schizoaffective disorder, dysthymia/depression, and somatoform disorder/chronic pain disorder.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work with lifting no more than 50 pounds occasionally and 25 pounds frequently, standing and walking for six hours in an eight hour day and sitting for six hours in an eight hour day with normal breaks, frequently climbing ramps and stairs, never climb ladders, ropes, or scaffolds, frequent balancing, stooping, kneeling, crouching, and occasional crawling, avoid concentrated exposure to hazardous machinery and unprotected heights, is limited to superficial interaction with co-workers, supervisors, and the general public by which excludes arbitration, negotiation, confrontation, the supervision of others, or responsibility for the health, safety, and welfare of others, limited to occupations where instructions can be given orally or by demonstration.

6. The claimant is unable to perform any past relevant work.

7. The claimant was born on December 28, 1955, and was 51 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date.  The claimant subsequently changed age category to advanced age.

8. The claimant has a limited education and is able to communicate in English.

   . . .

10. Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can performed.

11. The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2007, through the date of this decision.

(Tr. 15-21) (internal citations omitted).

## IV. DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  *See* 20 C.F.R. §§ 404.1505, 416.905.

## V. STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id.*

14

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  However, it may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VI.  ANALYSIS

### A.  Whether the ALJ erred in failing to adopted the prior ALJ's finding that limited Plaintiff to light work

Plaintiff contends that the ALJ erred under *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997), by failing to accept the Social Security Administration's 2007 Disability Determination that he was limited to light work activity. According to Plaintiff, new evidence in the record demonstrates a worsening in his physical condition since the prior determination. Perkins also emphasizes that the new ALJ identified additional non-severe physical impairments, which he argues further supports the conclusion that his condition deteriorated.  Plaintiff asserts that the ALJ should have been bound by the prior finding of light work, and if limited to this exertional level, he qualified for benefits under Medical Vocational Rule 202.02.

The Commissioner maintains that the ALJ reasonably declined to be bound by the 2007 determination based on new and material evidence in the administrative record, including all of the updated medical evidence.  The Commissioner specifically points to Plaintiff's failure to

comply with treatment for his diabetes, and a lack of limitations arising from Plaintiff's degenerative joint and disc disease in the knees, back, and ankles.

In *Drummond*, the Sixth Circuit confronted the question of whether the principles of res judicata applied against the Commissioner of Social Security on claims which have been previously determined. *Id.* at 842. The court held that "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id.* "The burden is on the Commissioner to prove changed circumstances and therefore escape the principles of res judicata." *Id.* at 843. Applying the res judicata principle, the court found that the Commissioner was bound to the prior conclusion that the claimant had the RFC to perform sedentary work, because the Commissioner did not produce substantial evidence showing that the claimant's condition had improved. *Id.*

Following the *Drummond* decision, the Social Security Administration ("SSA") issued Acquiescence Ruling 98-4(6), which explained how the SSA would apply *Drummond* within the Sixth Circuit, providing in relevant part:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations, or rulings affecting the finding or the method for arriving at the finding.

AR 98-4(6), 1998 WL 283902, at *3 (June 1, 1998).

In *Wilkerson v. Commissioner of Social Security*, No. 3:08-CV-419, 2010 WL 817307, at *11 (S.D. Ohio Mar. 5, 2010), the ALJ improperly described the legal criteria as set forth in *Drummond*. The court nevertheless concluded that the ALJ applied the correct legal criteria because the record contained new and material evidence of improvement. *Id.* at *12. The evidence included a report from a one-time consultative psychologist and testimony from a

16

medical expert who had reviewed the record and concluded that the plaintiff's impairment did not meet the listing. *Id.*

In the present case, the ALJ acknowledged that the 2007 Disability Determination qualified as a prior final decision and described the res judicata principle and its application. (Tr. 12-13).  The ALJ concluded that res judicata did not apply because there existed new and material evidence in the record regarding Plaintiff's impairments. (*Id.*). The ALJ acknowledged the existence of new non-severe physical impairments as well as an element of neuropathy connected to Plaintiff's diabetes. (*Id.*).  Despite these new medical issues, the remainder of the ALJ's opinion adequately identified new and material evidence of improvement sufficient to overcome the res judicata effect of the prior determination that Plaintiff was limited to light work.  For example, state agency reviewing physicians Drs. Starr and Albert both concluded that Perkins could perform medium work. (Tr. 19, 502-05, 510-17).  Additionally, medical expert Dr. Goren had the opportunity to review the entire record and opined that Plaintiff did not have any exertional limitations. (Tr. 20, 48-49).

Although Plaintiff argues that the record supports the conclusion that his conditioned had worsened, the evidence he points to does not sufficiently undermine the substantial evidence of improvement set out in the ALJ's opinion.  As the court explained in *Drummond*, the substantial evidence standard still applies to the review of the ALJ's conclusion that a claimant's condition has improved.  126 F.3d at 843.  Under the circumstances here, the ALJ's decision is substantially supported.  Accordingly, the ALJ properly found that Plaintiff was capable of medium work and that Plaintiff did not qualify for disability under the Medical Vocational Rules.

**B. Whether the ALJ erred in his evaluation of Tina Oney's opinion regarding Plaintiff's mental abilities**

Perkins' second allegation of error provides that the ALJ inappropriately evaluated the opinion of advanced practice nurse Tina Oney.  Plaintiff maintains that the ALJ's analysis of the opinion failed to comply with Social Security Ruling 06-03p. Furthermore, he argues that it was inappropriate for the ALJ to accord only little weight to Oney's opinion because Oney's treatment notes support the mental limitations she assigned and she had established a longitudinal treatment relationship.

Oney began treating Plaintiff in January 2009, after his care was transferred from Dr. Tran. (Tr. 565).  On December 12, 2009, Oney, under a physician's supervision, completed a mental residual functional capacity assessment in which she opined that Perkins was "extremely limited" with regard to all types of work-related mental activities. (Tr. 519). In support of these findings, she cited Plaintiff's paranoia, inability to tolerate people or public places, and low tolerance for frustration. (Tr. 520).

Social Security Ruling ("S.S.R.") 06-03p explains how the Commissioner should address opinions from sources who are not "acceptable medical sources," but rather, are deemed "other sources." S.S.R. 06-3p, 2006 WL 2329939, at *1 (Aug. 9, 2006).  Among these other sources are nurses. *Id.* at *1-2.  Information from other sources cannot establish the existence of a medically determinable impairment; however, the Commissioner should consider such information because it may be based on special knowledge of an individual and may provide insight into the severity of the individual's impairments and how they affect the individual's ability to function. *Id.*; *see Cruse v. Comm'r Soc. Sec.*, 502 F.3d 532 (6th Cir. 2007). Additionally, S.S.R. 06-3p states:

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these

"other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6.  The ruling indicates that the factors in 20 CFR 404.1527(d) and 416.927(d), which apply to the evaluation of medical opinions from acceptable medical sources, can be applied to the opinion evidence from other sources.  *Id.* at *4-5.  These factors, which the ALJ should consider, include: how long the source has known the claimant, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, and how well the source explains the opinion. *Id.*

Here, the ALJ's assessment of nurse Oney's opinion follows the requirements of the ruling and is supported by substantial evidence.  The ALJ set forth grounds supporting his decision to assign little weight to the opinion. (Tr. 20). The ALJ explained that the extreme limitations assigned by the nurse were not supported by Plaintiff's mental health treatment records from MetroHealth.  Specifically, the ALJ noted that within these records, treatment providers assigned Plaintiff a GAF score representative of only moderate symptoms. (*Id.*).

The ALJ's conclusion that treatment notes from MetroHealth fail to bolster the extreme limitations assigned by Oney is substantially supported in the record. Earlier in his opinion, the ALJ acknowledges that these notes show symptoms of agitation, loneliness, social withdrawal, and some auditory and visual hallucinations. (Tr. 18).  Nevertheless, Oney and other healthcare providers consistently assigned GAF scores that represented only moderate impairments. (Tr. 18-20).  Additionally, MetroHealth records indicate improvement with medication. (Tr. 19, 582-83, 536).  These treatment notes also consistently showed that Plaintiff's thought process was logical and organized, he was well oriented, his memory was intact, his speech was clear and goal-directed, and his attention and concentration were sustained. (*See, e.g.*, Tr. 553-54, 574, 589,

600-01, 657-58). These objective findings as reflected in the treatment notes relied up on by the ALJ undermine Oney's conclusion that Plaintiff was extremely limited in all work-related mental activities. The ALJ's reasoning adequately articulates and supports his decision to assign little weight to Oney's opinion.

Perkins maintains that the ALJ ought to have discussed the factors set forth in the regulations when evaluating Oney's opinion. While S.S.R. 06-3p instructs that the ALJ may apply these factors, neither the ruling nor the regulations require the ALJ to engage in a factor-by-factor analysis.  Plaintiff cites no authority, and the Court is unaware of any, to support the proposition that the ALJ must articulate an assessment of each factor.  So long as the ALJ's opinion conveys why the opinion was credited or rejected, the ALJ has satisfied his burden. Accordingly, Plaintiff's allegation of error is not well taken.

## VII. DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the final decision of the Commissioner is AFFIRMED.

IT IS SO ORDERED.

s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge


Date:  July 10, 2015.

20